FILED

11/15/2021

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
## August 3, 2021 Session

## STATE OF TENNESSEE v. CASEY LYNN HOPPER

**Appeal from the Circuit Court for Madison County**
**No. 19-570      Donald H. Allen, Judge**

_____

### No. W2020-00935-CCA-R3-CD
_____

The Defendant, Casey Lynn Hopper, appeals his convictions for felony evading arrest causing a risk of death or injury, a Class D felony; reckless endangerment with a motor vehicle, a Class E felony; driving with a revoked license and reckless driving, Class B misdemeanors; and speeding, a Class C misdemeanor, and his effective twelve-year sentence.  See Tenn. Code Ann. §§ 39-13-103, -16-603(b)(3)(B), 55-8-152, -10-205, -50-504.   In this appeal as of right, the Defendant argues that (1) the trial court erred by forcing the Defendant to choose whether to accept a plea offer or proceed to trial before the State produced complete discovery materials; (2) the State failed to collect or preserve favorable evidence, specifically a convenience store surveillance recording; (3) the State failed to provide the defense with exculpatory evidence, specifically a pair of binoculars; (4) the trial court improperly limited cross-examination by prohibiting the defense from introducing a photograph of a third party and questioning a police witness about him; (5) the Defendant's convictions for felony evading arrest and reckless endangerment violate double jeopardy; (6) the evidence is insufficient to support his convictions; and (7) the trial court erred by imposing consecutive sentencing.   After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Bruce Kelley, Jr., Memphis, Tennessee, for the appellant, Casey Lynn Hopper.

–1–

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

This case arises from a December 15, 2018 high-speed chase in Jackson, which occurred after an officer unsuccessfully attempted to stop a vehicle registered to the Defendant; the officer abandoned the pursuit due to safety concerns. The July 2019 term of the Madison County Grand Jury charged the Defendant with felony evading arrest by fleeing from law enforcement in a motor vehicle and creating a risk of death or injury to innocent bystanders or police officers, driving with a revoked license, reckless driving, speeding, and reckless endangerment by use of a motor vehicle as a deadly weapon. The Defendant's identity as the driver was the main issue at trial.

At trial, Jackson Police Department Patrol Officer Zachary Brown testified that he had worked for the department for about two and one-half years and that on December 15, 2018, after midnight, he was parked in a "Cash Master" parking lot across from a Shell gas station. He explained that officers frequently parked near gas stations at night and that if "a lot of people [were] coming in and out, if [they had] time [they would] run a license plate." Officer Brown noted that this technique was helpful for finding "people with warrants, people with stolen vehicles and also people driving on revoked and suspended license[s]."

Officer Brown testified that around 1:00 or 1:15 a.m., he ran the registration for a "reddish" Jeep Grand Cherokee at the Shell station, which was registered to the Defendant. Officer Brown did not know the Defendant. When Officer Brown searched for the Defendant in the "local system," he discovered that the Defendant's driver's license had been revoked, and the computer displayed the Defendant's driver's license photograph. Although Officer Brown did not recall seeing the Defendant exit the Jeep and enter the convenience store, he stated that he saw the Defendant exit the convenience store and return to the driver's side of the Jeep. Officer Brown agreed that the man who exited the convenience store and drove the Jeep was the same person depicted in the driver's license photograph. Officer Brown identified the Defendant in the courtroom.

Officer Brown testified that the Defendant drove away from the Shell station and that he followed in his patrol car. After traveling through a nearby intersection, Officer Brown activated his blue lights because the Defendant was driving with a revoked license.

–2–

The Defendant "began picking up speed" before turning left and continuing down a road with a thirty mile-per-hour speed limit. Officer Brown initially followed, but stated that his supervisor instructed him to end the pursuit after about one and one-half miles because it was raining. Officer Brown said that the Defendant was "passing vehicles in the rain . . . [at] speeds over [ninety] miles an hour." Officer Brown noted that although he did not know the exact speed at which the Defendant drove, Officer Brown was driving at about ninety miles per hour during the chase. Officer Brown opined that the situation was dangerous and that other peoples' lives were at risk. After his supervisor arrived, Officer Brown returned to the police station and obtained arrest warrants for the Defendant. Officer Brown was generally aware that the Defendant was arrested about one month later, although he was not present for the arrest.

Officer Brown testified that his dashboard camera recorded the incident beginning at thirty seconds before he activated his blue lights. The recording, which was black and white, was entered as an exhibit and reflected Officer Brown's following an SUV. It was raining. After both vehicles passed through an intersection, the police cruiser's siren was audible, and both vehicles accelerated. The SUV ran a stop sign and turned left onto a two-lane road, and Officer Brown followed. The SUV continued to accelerate, sometimes driving left of the center line, and was eventually not visible. Officer Brown passed a white SUV that had pulled over on the side of the road near a guard rail, and he pulled into a vacant lot and stopped a short time later. Officer Brown noted during his testimony that the two-lane road had curves and train tracks; he identified a set of tail lights visible at the end of the recording as belonging to a second vehicle the Defendant had passed. He stated that by the end of the chase, he had lost sight of the Jeep.

Officer Brown identified a certified copy of the Defendant's driving history record, which reflected that the Defendant's driver's license was revoked from February 25, 2005, until December 17, 2018. A new license had been issued on December 20, 2018.

On cross-examination, Officer Brown testified that at the time of the incident in this case, he had been assigned to patrol by himself for about one year. Officer Brown stated that the Defendant kept the Jeep on the road, although he noted that the Defendant crossed the center line near where the white SUV had parked. He agreed that the Defendant "moved over to the left to move by that car safely" and that at the preliminary hearing, he testified that the Defendant did not "run anybody off of the road[.]" Officer Brown acknowledged that he did not know to whom the tail lights visible at the end of the recording belonged. Officer Brown agreed that he did not see the Jeep again that day.

Officer Brown testified that he had parked facing the Shell station convenience store, and he identified his location on photographs of the Cash Express parking lot and the

–3–

Shell station lot.   The photographs reflected that a four-lane road with an additional center turning lane separated Cash Express and Shell.   Officer Brown stated that it was dark and raining and that the Defendant had operated his vehicle correctly while pulling into the Shell station.   Officer Brown did not recall at which gas pump the Defendant parked.   He noted that the Jeep was parked facing away from him such that he could read the license plate.   Officer Brown agreed that he used a "side" view of the Defendant to identify him as he walked to the Jeep and that he identified the Defendant from the frontal driver's license photograph.   Officer Brown acknowledged that at the preliminary hearing, he testified that he knew the Defendant's license was revoked by the time the Defendant returned to the Jeep.   He said, though, that he no longer remembered at what time he read that the Defendant's license was revoked.   He stated that to his recollection, he discovered no violations of the law when he ran the Defendant's tags. Officer Brown stated that it was possible he only saw the Defendant for "a second or two," although he noted that he did not know the exact time.   He agreed that he was between fifty-five and sixty yards away from the Defendant.   Officer Brown maintained, though that he could identify the Defendant.   The following exchange occurred:

Q. Okay.   It would have been a lot easier to see that person and be more accurate if he were closer, would it not have been?

A.   Yes, sir.   I keep binoculars in my car.

Q.   Are you saying you've got binoculars?

A.   Yes, sir.

Q.   You have never before mentioned you have binoculars, have you?

A.   I don't believe I did, but I keep binoculars in my car.   They are . . . in my patrol bag out in my vehicle right now.

Q.   Okay.   So, now for the first time in court you are saying you used binoculars?

A.   Yes, sir.   I believe I spoke with D.A., whoever presented the case in City Court about that.

Q.   I'm talking about when you [were] in the hearings and everything you never mentioned you made an ID with binoculars, did you?

A.  I don't believe so.

Q.  You never provided any of those binoculars to the defense or anything, did you?

A.  No, sir.

Q.  Nothing in the report about using binoculars, is there?

A.  No, sir.

. . . .

Q.  You couldn't identify him without binoculars, could you?

A.  Probably not.

When asked why he did not use his body camera to record the Defendant, Officer Brown noted that it could not zoom in on an image.  He stated that he could see the Defendant "without a zoom, but binoculars [gave] a better picture of someone."

Officer Brown agreed that even with the binoculars, he only saw the Defendant from the side for one to two seconds.  Although Officer Brown did not remember what the Defendant wore, he denied that the Defendant wore a hat.  Officer Brown noted that he was "matching [the Defendant's] face to make sure that was him."  He stated that he picked up his binoculars as the Defendant exited the convenience store.  Officer Brown said that he did not think it was important to include in his report that he saw the Defendant through his binoculars.  Officer Brown noted that it would be "harder" to identify someone without binoculars, although he disagreed that it was almost impossible.

At this juncture, defense counsel showed Officer Brown a photograph[1] on a cell phone, and Officer Brown agreed that the person in the photograph "would also look similar."  The following exchange occurred:

Q.  Okay.  And if from a profile that person could also appear to be –

[THE STATE]:  Your Honor, speculation.

---

[1] The appellate briefs indicate that the photograph, which is not part of the appellate record, was of the Defendant's brother.  The person in the photograph was never identified at trial.

[DEFENSE COUNSEL]:  I'm asking –

THE COURT:  Objection sustained as far as speculation.

Q.  Okay.  That's a person that looks very similar; is that correct?

A. Yes, sir.

Q.  Okay.  And to the person that you've identified in this case; is that right?

A.  Yes, sir.

Officer Brown agreed that the photograph defense counsel showed him was not of the person's profile or side.  When asked whether he knew "for sure" which man he saw on the night of the incident, given that the Defendant and the man in the photograph looked similar, Officer Brown responded that he had never seen the photograph of the man before. Defense counsel then asked, "I'm just asking if that man turned and you saw a profile of him, would it not be the same or similar to what you have seen from the other person?" The State objected to relevance, and the trial court sustained the objection.  Defense counsel moved to enter the photograph into evidence, and the State again objected on the basis of relevance.

The trial court asked for a side bar conference, during which it examined the photograph, and the following discussion occurred:

THE COURT: You're objecting to the photograph?

[THE STATE]:  I object to relevance, Your Honor.  This is an unknown individual who is not the [D]efendant in this case and I don't see the relevance to it at all.

THE COURT:  What's the relevance?

[DEFENSE COUNSEL]:  The relevance is that we have different individuals – actually the –

THE COURT:  I'm going to sustain the objection.  I don't see any relevance.  I mean, you can ask . . . him about the identification, but he didn't identify this person as being the person.  He identified your client.

[DEFENSE COUNSEL]: I understand.

THE COURT: I mean, I understand what you're suggesting, but there is no relevance to this photograph based upon the testimony. How is that relevant to this –

[DEFENSE COUNSEL]: Because he says it looks similar in appearance. So how can he say the one wouldn't look similar on profile?

[THE STATE]: Your Honor, it's irrelevant. Unless they are going to produce him as the driver, it's irrelevant.

THE COURT: I'll sustain the objection. I don't see the relevance of it at this point. The objection is sustained.

Testimony resumed, and Officer Brown affirmed that he did not have his binoculars with him in the courtroom, although he reiterated that they were in his police cruiser. Officer Brown agreed that he identified the Defendant "based upon" using the binoculars. Officer Brown stated that he was not using radar equipment at the time of the incident and that he used his own speedometer to assess the Defendant's speed. He noted that his supervisor reviewed the recording and that the recording provided the supervisor with Officer Brown's "top speeds" during the incident. Officer Brown agreed, though, that the recording presented at trial did not show his speed. Officer Brown disagreed that his top speed was higher than the Defendant's speed, and he noted that he was unable to catch up to the Defendant. Officer Brown stated that the Defendant passed two other vehicles during the chase, although he acknowledged that he did not see the Defendant pass the second vehicle.

Officer Brown testified that he received information about the Jeep's owner before he saw the Defendant's driver's license photograph. He denied assuming that the Jeep's owner was driving that night. He reiterated that he did not see the driver exit the Jeep and that he was uncertain who was driving until he looked at the photograph and looked at the Defendant through his binoculars. Officer Brown did not recall how many times he looked at the photograph before looking at the Defendant, although he stated that he would have looked at the photograph more than once. When asked whether the identification was "influenced" by the Defendant's driver's license photograph and knowing that the Defendant owned the Jeep, Officer Brown responded negatively.

Officer Brown testified that after the chase, he did paperwork and asked other officers to go to one of the Defendant's previous addresses. Officer Brown acknowledged that a photograph of the Defendant on the night of the incident would have been better evidence; he said that he did not "maintain the effort to obtain a picture" of the driver and that he was uncertain why he did not do so. He was aware that the Shell station had a surveillance system, and he did not attempt to obtain the recording. Officer Brown did not know for how long the surveillance recordings were preserved.

When asked why the police waited to arrest the Defendant, Officer Brown testified that after he submitted the warrants, they had "to be signed off on" before becoming active in the system. He stated that after the warrants were active, other officers arrested the Defendant. Officer Brown reiterated that he waited to pull over the Defendant until a safe area was available; he agreed, though, that before the chase began, the Defendant drove through an area in which many safe places to stop existed. Officer Brown noted that in Jackson, there was traffic "all night," although he did not remember the number of cars he saw on the night of the incident.

On redirect examination, Officer Brown testified that he and "a couple of [his] partners" typically carried binoculars. He denied that there was "[a]nything wrong with" having binoculars, and he noted that they were an "extra tool to have." He further denied that he had ever been asked about the binoculars. Officer Brown stated that during the chase, he looked at his speedometer as much as he could. He noted that generally, his supervisor would ask for his speed, the traffic conditions, and the "charges" and that this sometimes related to the decision whether to continue the pursuit. Officer Brown said that his top speed was "in the 80's." He denied that he ever saw a second person in the Jeep.

On recross-examination, Officer Brown testified that in the preliminary hearing, he discussed the Jeep's tinted windows and that he would have had to use "a tint meter" on the window to measure the amount of tint. He denied that he could determine how dark the Jeep's windows were by using the binoculars. He agreed that he "never pursued anything" related to the tinted windows.

At the close of the State's evidence, defense counsel raised in a jury-out hearing "the surprise about the introduction of the use of binoculars." The trial court stated that no one had previously asked Officer Brown about them and that in the court's opinion, "[t]hat would have been one of the first questions . . . he should have been asked." Defense counsel agreed and added that one would think Officer Brown would have included it in his report. Defense counsel said, "Well, I'm just saying if there had been binoculars, I would have asked to see the binoculars or whatever he was using." The trial court noted Officer Brown's testimony that the binoculars were in his police cruiser and stated that

defense counsel could "argue that to the jury."   Defense counsel stated that they were "not supposed to have surprises like this," and the court responded that no one had asked Officer Brown about the binoculars.   The court stated that in the light most favorable to the State, Officer Brown testified that he identified the Defendant using the binoculars and the driver's license photograph.   Defense counsel noted that the driver's license photograph likewise had not been entered into evidence, and the court stated that no one ever asked Officer Brown about the photograph.

The Defendant's proof consisted of a sole witness, Shell station owner Waydi Kattoum.   Mr. Kattoum testified that his surveillance system recorded people entering and leaving the building.   He noted that the recording quality was "excellent" and that he had previously provided law enforcement with copies of recordings in unrelated cases.   Mr. Kattoum stated that the system was working on December 15, 2018; although he did not recall any officers' coming to the station and viewing a recording related to that evening, he noted that he generally did not remember that period due to the passage of time.   Mr. Kattoum explained that after seven days, the system would tape over existing recordings and that the deleted recordings could not be retrieved.   Mr. Kattoum used a "range finder" to measure the distance between the Cash Express parking lot and two locations[2] outside the Shell station, which was fifty-seven and sixty yards, respectively.

After the close of the Defendant's proof, defense counsel requested that the trial court instruct the jury on the duty to preserve evidence.   See T.P.I.—Crim. 42.23.   The trial court noted that the State's witnesses had not testified that "there [was] anything exculpatory about it."   Defense counsel discussed the surprise involving Officer Brown's binoculars.   Counsel then argued:

> [T]he best evidence that was available in regard to [identity] . . . was the photographs at the Shell station.   The police officers knew about it.   He just said that he didn't go do it.   They know about it.
>
> The best evidence of identification of whoever was driving that vehicle was in the videos that were taken at the Shell station and were available for seven days.   [The Defendant] wasn't even arrested till January the 15th to be put on notice.   It was long gone by then.

The trial court noted that per the pattern jury instruction, the State had "no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory

---

[2] One of the measurements was taken from "pump 2"; however, the second location was unclear, and it was not apparent which measurement related to which location.

value[.]"   The court stated that Officer Brown observed the Defendant and identified him based upon his driver's license photograph.   Defense counsel asserted that Officer Brown was not the person to determine what was exculpatory.   The court responded that counsel could argue the issue to the jury and that the situation was not one in which the State possessed evidence and subsequently destroyed it.   Defense counsel said that the police "elected not to go get the evidence."   The court opined that Officer Brown did not think about the recording until defense counsel asked him about it.   The court declined to give the requested instruction, finding that Officer Brown had no duty to request a copy of the recording.

Upon this evidence, the Defendant was convicted as charged and sentenced to an effective twelve years in confinement.   After his motion for new trial was denied, the Defendant timely appealed.

ANALYSIS

In this appeal, the Defendant argues that (1) the trial court erred by forcing the Defendant to choose whether to accept a plea offer or proceed to trial before the State produced complete discovery materials; (2) the State failed to collect or preserve favorable evidence, specifically the Shell station surveillance recording; (3) the State failed to provide the defense with exculpatory evidence, specifically a pair of binoculars; (4) the trial court improperly limited Officer Brown's cross-examination by prohibiting the defense from introducing the third-party photograph and questioning Officer Brown about the third party; (5) the Defendant's convictions for felony evading arrest and reckless endangerment violate double jeopardy; (6) the evidence is insufficient to support his convictions; and (7) the trial court erred by imposing consecutive sentencing.[3]  We will address each in turn.

I.      *Decision to proceed to trial*

The Defendant contends that the trial court forced him to choose whether to proceed to trial before having received full discovery, specifically the binoculars and the time at which Officer Brown received the Defendant's driver's license photograph.   The State responds that this issue has been waived.

We agree that waiver is merited because this section of the Defendant's brief does not include citations to authority or otherwise inform this court of the legal basis upon which his argument relies.   See Tenn. Ct. Crim. App. 10(b) ("Issues which are not

---

[3] We have reordered the issues presented in the Defendant's brief for concision.

–10–

supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Moreover, it is well-settled that when a party seeks appellate review, it has a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. See State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling was presumed correct in the absence of an adequate record on appeal). When the record is incomplete, an appellate court is precluded from considering the issue. See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). The record contains no transcripts or other filings documenting the incident in which the Defendant was allegedly forced to proceed before receiving full discovery. This issue, therefore, has been waived.

We also conclude that plain error relief is not warranted. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice.

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

In this case, the record does not clearly establish what occurred in the trial court because no relevant transcripts are part of the trial record or the record on appeal. The record reflects only that the Defendant filed a pretrial motion for the State to produce the National Crime Information Center (NCIC) record Officer Brown saw on the night of the incident. The trial court subsequently issued an order finding that federal law prohibited the State from producing the record and instructing the State to disclose to the Defendant the exact time of the NCIC request, if possible. The trial transcript similarly does not contain a contemporaneous objection or otherwise address this issue. See Tenn. R. App. P. 36(a). The Defendant is not entitled to relief on this basis.

II.    *Shell station recording*

The Defendant contends that his trial was fundamentally unfair due to the loss of the Shell station surveillance recording. He argues that the recording, which was deleted before his arrest, was exculpatory and would have disproven Officer Brown's identification of him at the scene. The Defendant requests for this court to overturn his convictions and dismiss the charges; alternatively, he argues that the trial court erred by refusing to instruct the jury on lost evidence and requests for us to remand his case for a new trial. The State responds that it had no duty to collect the evidence and that consequently, no error occurred.

In State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." State v. Merriman, 410 S.W.3d 779, 784 (Tenn. 2013) (citing Ferguson, 2 S.W.3d at 915-16). The court rejected a "bad faith" analysis in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." Id. at 785. Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." Id. at 784-85 (citing Ferguson, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence" and observed that the State's duty to preserve was "limited to constitutionally material evidence." Merriman, 410 S.W.3d at 785. The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (citing Ferguson, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." Id. (citing Ferguson, 2 S.W.3d at 917).

If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: "(1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction." Id. (quoting Ferguson, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an

appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Id. at 785-86.

In previous cases, this court has examined whether the State had a duty to collect surveillance recordings as evidence. In State v. Yevette Somerville, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730 (Tenn. Crim. App. Feb. 11, 2002), the defendant was arrested and accused of shoplifting at a Walmart store. The store's surveillance recording was taped over later on the day of the offense. Id. at *4. This court concluded that the State had no duty to collect the recording, noting that the recording's exculpatory value was not apparent before it was destroyed, given that neither the State nor the defendant viewed it before it was erased, and that the parties could only speculate as to its contents. Id. This court also noted that the recording would only have shown the cashier stations and that the defendant could have shoplifted out of view of the cameras. Id. This court stated, "In addition, it is doubtful that the tape was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)). Finally, this court discussed that the tape was "equally accessible to the State and the defendant" and that the State was not required to disclose evidence not in its possession or that of another governmental agency. Id. (quoting State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted)).

Subsequently, in State v. Mario Hubbard, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372 (Tenn. Crim. App. June 7, 2017), this court examined the State's duty to collect a surveillance recording of a car dealership parking lot during an incident in which the defendant was witnessed committing auto burglary. In that case, the surveillance recordings were deleted after forty-eight hours, and a police officer spoke to the dealership owner, learned that the cameras may not have been working, and erroneously assumed that detectives would follow up to verify whether the incident was recorded. Id. at *7. This court concluded that the State did not have a duty to preserve the recording because "if it ever existed, [it] was never in the possession of the State or another governmental agency, and both parties had an equal ability to obtain the video." Id. at *7. We also concluded that the recording had no exculpatory value, noting that a bystander and a police officer saw the defendant at the dealership, that the bystander witnessed the defendant breaking into a vehicle, and that both witnesses identified the defendant in the courtroom. Id. at *8.

In this case, the record reflects that Officer Brown never viewed or requested the Shell station recording, and the Defendant called Mr. Kattoum to testify that the recording would have shown customers as they entered and exited the store. The recordings were preserved for one week after the incident. The Defendant was not arrested until one month after the incident. The Defendant subsequently requested a jury instruction on lost

–13–

evidence, and the trial court found that because the evidence was never in the State's possession, the instruction was not fairly raised by the proof.

The Defendant's case is not as straightforward as those in Sommerville and Hubbard due to the delay in the Defendant's arrest and notice of the charge. Because the recording was erased before the Defendant was arrested, it is difficult to conclude that he and the State had "equal access" to the recording. However, we are constrained to agree with the trial court that the State had no duty to collect the recording. As in Hubbard, Officer Brown saw and identified the Defendant at the Shell station when he re-entered the Jeep; he also identified the Defendant in the courtroom. 2017 WL 2472372, at *7. Like Sommerville, none of the parties or investigating officers ever viewed the recording, and the Defendant must speculate as to its contents. 2002 WL 1482730, at *4. Finally, the record reflects that the State or another governmental agency never possessed the recording. See Marshall, 845 S.W.2d at 233. The State had no duty to collect the recording, and consequently, a Ferguson instruction or dismissal of the charges was not merited. The Defendant is not entitled to relief on this basis.

### III.    *Brady binocular issue*

The Defendant contends that the State violated his due process rights by failing to disclose the binoculars Officer Brown used to identify him. The Defendant argues that the surprise of the "devastating" evidence created a "trial by ambush." The State responds that the evidence was not material and could have, at most, provided slightly more evidence with which to impeach Officer Brown.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted).

To prove a Brady violation, a defendant must demonstrate the following:

(1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not);

(2) that the State suppressed the information;

–14–

(3) that the information was favorable to the defendant; and

(4) that the information was material.

Id. at 56 (citations omitted). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). When examining a Brady issue, this court reviews a trial court's findings of fact de novo with a presumption of correctness, and the trial court's conclusion of law, including whether evidence was favorable or material, de novo with no presumption of correctness. Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)

In this case, the Defendant filed a general pretrial discovery motion, including a request for Brady evidence. Officer Brown failed to disclose until cross-examination at trial that he used binoculars to identify the Defendant from across the street; he claimed that no one ever asked him about the binoculars, although he thought that he mentioned it to the prosecutor in "City Court." The preliminary hearing transcript reflects that Officer Brown never testified about binoculars at the hearing. Officer Brown also stated at trial that the binoculars were inside his police cruiser in the courthouse parking lot. The trial court denied a special jury instruction regarding the binoculars, commenting multiple times that neither party had asked Officer Brown if he used binoculars.[4]

Although we acknowledge that an evidentiary surprise at trial is far from ideal, we are constrained to conclude that the Defendant has not established that the binoculars were

---

[4] We note that even if the prosecutor's office had no knowledge of the binoculars, a prosecutor "is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" Strickler v. Greene, 527 U.S. at 263, 275 n. 12 (citing Kyles, 514 U.S. at 437). Our supreme court has previously observed that "even if the State was not actually aware of the [favorable evidence] within its possession, it is charged with knowledge of [the evidence] for purposes of Brady." Johnson v. State, 38 S.W.3d 52 n. 4 (Tenn. 2001) (citing Strickler, 527 U.S. at 275 n. 12).

favorable evidence.   Indeed, as the Defendant notes in his brief, the binoculars undermined the defense strategy of discrediting Officer Brown's ability to identify the Defendant, who was about sixty yards away on a dark and rainy night and only visible to Officer Brown for a few seconds at a sideways angle.   We note that after learning of the binoculars, the Defendant chose not to request a recess or continuance to inspect them in spite of their being outside the courthouse.   See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Nevertheless, even if the binoculars had some impeachment value, the Defendant's argument would likewise fail because he has not shown that the evidence was material— that is, a reasonable probability that the result would have been different had he known about the binoculars.   Defense counsel thoroughly cross-examined Officer Brown about his ability to identify the Defendant given the weather conditions, as well as his failure to tell anyone that he used binoculars.   Despite counsel's meticulous efforts at impeachment, the jury credited Officer Brown's testimony and convicted the Defendant.   Any additional potential impeachment evidence from the binoculars would not reasonably have led to a different result.   The Defendant is not entitled to relief on this basis.

In a related issue, the Defendant argues that the State's failure to disclose the binoculars violated Tennessee Rule of Criminal Procedure 16, which establishes the rules for providing discovery in a criminal case.   Relevant to this case, Rule 16(1)(F) provides that upon a defendant's request, "the state shall permit the defendant to inspect and copy or photograph . . . tangible objects . . . if the item is within the state's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."   If a party fails to comply with a discovery request, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems necessary under the circumstances.

Tenn. R. Crim. P. 16(d)(2)(A)-(D).   "[W]hether the defendant has been prejudiced by the failure to disclose is always a significant factor" in the court's determining an appropriate remedy.   State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995) (citing State v.

Baker, 751 S.W.2d 154, 160 (Tenn. Crim. App. 1987)). "[T]he burden rests on the defense to show the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

In this case, the binoculars did not belong to the Defendant and were not obtained from him. Similarly, the record does not reflect that the State intended to use the binoculars in its case-in-chief at trial; indeed, the prosecutor seemed unaware that they existed until Officer Brown's cross-examination. We consider, then, whether the binoculars were material to preparing the defense.

The Defendant has not carried his burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." See id. The defense strategy was to cast doubt on Officer Brown's identification, which defense counsel maintained throughout the trial. The Defendant does not argue that he would have pursued a different theory of defense had he known about the binoculars, and defense counsel thoroughly cross-examined Officer Brown about all weaknesses in his identification, including failing to mention the binoculars previously. As we discussed above, the binoculars were not material. The Defendant is not entitled to relief on this basis.

*IV.    Cross-examination*

The Defendant contends that the trial court improperly limited his cross-examination of Officer Brown by excluding the photograph of a third party and disallowing any questions about whether the third party's profile would resemble that of the Defendant. The State responds that no error occurred because the evidence was irrelevant and called for speculation.

We note that the Defendant's brief only raises this issue in the context of relevance pursuant to Tennessee Rule of Evidence 401. Accordingly, we will examine this issue in that limited context.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. The Advisory Commission Comments to Rule 401 state that, "[t]o be relevant, evidence must tend to prove a material issue." Tenn. R. Evid. 401, Advisory Comm'n Cmts.

–17–

The record supports the trial court's determination that the photograph and associated questioning were irrelevant to the Defendant's case. At the time defense counsel attempted to question Officer Brown about the photograph of a third party, counsel had not established who the third party was or alleged that the third party was present on the night of the incident. Accordingly, counsel had not laid a foundation that the photograph and line of questioning would yield information making it more or less likely that the Defendant was the person driving. Moreover, Officer Brown testified that he had never seen the photographed person before, so any opinion he gave on whether the person would have resembled the Defendant when standing in profile would have been speculation. See Tenn. R. Evid. 602 (excluding witness testimony about matters in which the witness lacks personal knowledge). The record does not reflect that the trial court abused its discretion by excluding the evidence, and the Defendant is not entitled to relief on this basis.

*V.     Double Jeopardy*

The Defendant contends that his dual sentences for reckless endangerment and felony evading arrest violate double jeopardy principles, arguing that the manner in which the Defendant was charged punishes him twice for the same conduct. The State responds that the offenses have discrete elements.

Both the United States and Tennessee Constitutions protect against a criminal defendant being placed in double jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. This protection includes: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). At issue here is the last of these protections, protection against multiple punishments for the same offense, specifically, a "multiple description claim." A claim that multiple convictions violate the protection against double jeopardy is a mixed question of law and fact, which this court will review de novo without any presumption of correctness. State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing State v. Thompson, 285 S.W. 3d 840, 846 (Tenn. 2009)).

Multiple description claims "arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" Watkins, 362 S.W.3d at 544. As such, we are tasked with determining whether the Defendant committed multiple offenses or only one. Id. In doing so, we apply the test announced

in Blockburger v. United States, 284 U.S. 299 (1932). See also Watkins, 361 S.W.3d at 556 (adopting the Blockburger test).

The Blockburger test provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. The central analysis of the Blockburger test "requires an examination of the statutory elements [of the offenses] in the abstract, without regard to the proof offered at trial in support of the offenses." Watkins, 362 S.W.3d at 544. "If each offense includes an element that the other offense does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Id. (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)) (internal quotation marks omitted).

The first step in the Blockburger test is to determine the threshold question of "whether the convictions arise from the same act or transaction." Watkins, 362 S.W.3d at 556. "If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment." Id. In answering this question, we refer "to the charging instrument and the relevant statutory provisions" and "consider whether the charges arise from discrete acts or involve multiple victims." Id. The second step of the Blockburger test requires us "to examine the statutory elements of the offenses." Watkins, 362 S.W.3d at 557. The following presumptions apply to our examination of the statutory elements of the offenses:

> If the elements of the offenses are the same, or one offense is a lesser-included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Id. (internal footnote omitted).

As charged here, "it is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1). Further, if the act "creates a risk of death or injury to innocent bystanders, pursuing law enforcement officers, or other third parties," the offense is classified as a Class D felony. Tenn. Code Ann. § 39-16-603(d)(2)(B).

A person commits reckless endangerment who "recklessly engaged in conduct which placed or could have placed another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). A person acts recklessly "with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-302(c). In addition, the risk "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id. "Reckless endangerment committed with a deadly weapon is a Class E felony." Tenn. Code Ann. § 39-13-103(b)(2). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(6)(B).

The Defendant argues that double jeopardy principles are implicated not by the dual convictions for the offenses themselves, evading arrest in a motor vehicle and reckless endangerment, but rather by dual punishments for reckless endangerment and the statutory circumstances elevating evading arrest to a higher felony class. This a creative yet unconvincing argument, as the test devised in Blockburger and adopted by Watkins utilizes every element of the two offenses. We must examine all elements of each statute and not simply parts of one or both; to do otherwise is not supported by precedent.

Applying the Blockburger test, evading arrest in a motor vehicle requires an intentional decision to flee or evade a law enforcement officer after a signal to stop, which reckless endangerment does not require. Likewise, reckless endangerment requires only unspecified reckless conduct, which encompasses a vast category of actions other than fleeing from a police officer. Because the offenses both contain discrete elements, dual convictions and punishments for them do not violate double jeopardy. See State v. Cross, 362 S.W.3d 512, 521-22 (Tenn. 2012). The Defendant is not entitled to relief on this basis.

## VI.    Sufficiency of the evidence

The Defendant contends that the evidence of his identity is insufficient, arguing that because the trial court determined that

it would be speculative and irrelevant testimony to identify a person from only a side view of that person's fac[e], based solely from a photograph of the front view of that person's face, [it] should not have allowed a conviction to stand on the same manner of identification of the [D]efendant as the driver of the vehicle in question.

The Defendant does not challenge the other elements of the offenses. The State responds that the evidence of identity is sufficient.

As a preliminary matter, in this section of his appellate brief, the Defendant raises an additional evidentiary claim that because the Defendant's driver's license photograph was not introduced as evidence, "all testimony stemming from the picture should not be allowed nor considered as evidence in this case." See Tenn. R. Evid. 1002 (frequently referred to as the "best evidence rule"). The Defendant raised no best evidence objection at trial relative to the driver's license photograph, and this issue has been waived. See Tenn. R. App. P. 36(a).

Secondly, the Defendant misconstrues the trial court's statements when ruling that the photograph of an unidentified third party was irrelevant and that Officer Brown would have to speculate about his ability to identify the third party from the side. The trial court excluded the photograph and line of questioning because Officer Brown had never seen the third party before and could not conjecture how the man would look from the side. In contrast, Officer Brown's testimony regarding his ability to identify the Defendant from the side was relevant because the Defendant was on trial and not speculative because he actually saw the Defendant's profile and compared it to the driver's license photograph. In contrast, the Defendant never alleged that the third party drove the Jeep or that the third party was otherwise involved in the incident. As a result, evidence about whether the third party resembled the Defendant in profile did not make it more or less likely that the Defendant was driving the Jeep that night. The trial court's evidentiary ruling and its affirming the verdict as thirteenth juror were not inconsistent.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

In this case, Officer Brown testified that after searching for the registered owner of the Jeep on his police cruiser computer, he found the Defendant's name, and a subsequent record search yielded the Defendant's driver's license photograph. Officer Brown watched the Defendant reenter the Jeep through binoculars and confirmed that the driver's profile was consistent the Defendant's photograph. This court has previously noted that "[i]f a witness viewed the perpetrator under circumstances which would permit a positive identification to be made, 'the credible testimony of one identification witness is sufficient to support a conviction.'" State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)

–22–

(quoting State v. Darius Alexander Cox, No. M2017-02178-CCA-R3-CD, 2019 WL 1057381 (Tenn. Crim. App. Mar. 6, 2019)). The Defendant thoroughly cross-examined Officer Brown regarding the time of night, the rain, and his ability to make a conclusive identification in a brief span of time given his viewing angle. The jury, by its verdict, credited Officer Brown's identification, and we will not disturb its credibility determination. The Defendant is not entitled to relief on this basis.

*VII.    Sentencing*

The Defendant contends that the trial court erred by imposing partial consecutive sentences. He reiterates his argument that dual convictions for Class D felony evading arrest creating a risk of death or injury to innocent bystanders and reckless endangerment violate double jeopardy principles, which we addressed above.

We note that the Defendant's discussion of the relevant authorities does not address the propriety of consecutive sentencing governed by Tennessee Code Annotated section 40-35-115, but rather relies upon double jeopardy jurisprudence. The Defendant requests this court to order concurrent service of the sentences "or merge [them.]" However, if the dual convictions violated double jeopardy, the proper remedy would be to merge the convictions, not order concurrent service of the sentences. See, e.g., State v. Berry, 503 S.W.3d 360, 362 (Tenn. 2015) (discussing that "[i]t is well settled in Tennessee that, under certain circumstances, two convictions . . . must merge into a single conviction to avoid double jeopardy implications," including in cases when the jury returns two guilty verdicts and one of the offenses is a lesser-included offense of the other).

Likewise, at trial and on appeal, the Defendant referred to improperly applied "enhancement factors," when in fact he referred to the circumstances that elevated evading arrest from a Class E felony to a Class D felony. The evading arrest statute has no bearing on the enhancement factors a trial court considers when setting the length of a sentence in felony cases. See Tenn. Code Ann. §§ 39-16-603(b), 40-35-113.

Because the Defendant raises no freestanding sentencing issue, we rely upon our discussion of double jeopardy above to conclude that he is not entitled to relief relative to his dual convictions for felony evading arrest and reckless endangerment. For the sake of thoroughness, we note briefly that the trial court properly ordered partial consecutive service based upon the Defendant's extensive criminal record, including four felony convictions, twenty-four misdemeanor convictions, and ten previous terms of probation, and the Defendant's being on misdemeanor and felony probation at the time he committed the offenses in this case. See Tenn. Code Ann. § 40-35-115(b)(2), (b)(6). The Defendant is not entitled to relief on this basis.

–23–

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE